IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---------------------------------------------------------------x
HUDSON BAY MASTER FUND, LTD., :
:
                 Plaintiff, : Case No.:
:
   - against - :
:
SOCKET MOBILE, INC., :
:
                 Defendant. :
:
:
---------------------------------------------------------------x

## COMPLAINT

Plaintiff Hudson Bay Master Fund, Ltd. ("Hudson Bay"), by its attorneys, Greenberg Traurig, LLP, for its complaint against Defendant Socket Mobile, Inc. ("Socket"), alleges as follows:

## NATURE OF THE ACTION

1. Under a Warrant to purchase shares of Socket's common stock, Hudson Bay is entitled to a significant downward adjustment of the exercise price of the Warrant, and a substantial increase in the number of shares of Socket's common stock to which it is entitled under the Warrant. Without justification or cause, Socket has refused to honor its obligations under the Warrant, thereby diluting the value of the Warrant to Hudson Bay's detriment. Socket also has breached the parties' Amended and Restated Security Purchase Agreement by disclosing the name of Hudson Bay, without Hudson Bay's consent, in multiple public filings.

2. Hudson Bay seeks declaratory relief, preliminary and permanent injunctive relief, and damages arising out of Socket's breach of its obligations under the Warrant and the Amended and Restated Security Purchase Agreement.

1

## PARTIES

3. Plaintiff Hudson Bay is a private investment fund organized under the laws of the Cayman Islands with its registered office in the Cayman Islands, managed by Hudson Bay Capital Management LP with a principal place of business in New York, New York.

4. Defendant Socket is, upon information and belief, a corporation organized under the laws of the State of Delaware, with its principal place of business located in Newark, California.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction based upon diversity of citizenship under 28 U.S.C. § 1332(a). The matter in controversy, exclusive of interest and costs, exceeds $75,000.

6. This Court has personal jurisdiction over Socket and venue is proper in this Court. Under the Warrant and the Amended and Restated Security Purchase Agreement, Socket "irrevocably submit[ted] to the exclusive jurisdiction of the…federal courts sitting in the Chicago, Illinois, for the adjudication of any dispute" relating to the Warrant and the Amended and Restated Security Purchase Agreement, and "irrevocably waive[d], and agree[d] not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper."

## FACTUAL ALLEGATIONS

### The Purchase of the Warrant.

7. On or about November 19, 2010, the parties executed an Amended and Restated Securities Purchase Agreement ("Amended SPA"), whereby Socket agreed to sell to Hudson

Bay, *inter alia*, a Warrant ("Warrant") to purchase 500,000 shares of Socket's Common Stock at an exercise price of $2.44 per share (the "Initial Exercise Price"), subject to adjustments as provided therein. A true and correct copy of the Amended SPA is attached hereto as Exhibit A.

8. The Warrant was issued to Hudson Bay on or about November 19, 2010. A true and correct copy of the Warrant is attached hereto as Exhibit B.

9. On or about August 19, 2011, the parties entered into an Amended and Exchange Agreement ("Exchange Agreement"), which ratified the Amended SPA and other related transaction documents, including the Warrant, leaving the Warrant in "full force and effect." A copy of the Exchange Agreement is attached hereto as Exhibit C.

10. Under Section 1(a) of the Warrant, Hudson Bay is permitted to exercise the Warrant by delivering written notice to Socket of Hudson Bay's election to exercise in the form annexed to the Warrant (the "Exercise Notice") and specifying the number of Warrant Shares and form of exercise price for the applicable exercise.

11. Section 1(a) permits Hudson Bay to pay cash for the Warrant Shares, *i.e.*, the exercise price of the Warrant multiplied by the number of Warrant Shares subject to the applicable exercise. Alternatively, under specific circumstances, Section 1(d) permits a cashless exercise of the Warrant pursuant to a preset formula.

12. The Warrant enumerates Socket's obligations upon receipt of an Exercise Notice, the deadlines for compliance, and specific remedies available to Hudson Bay for non-compliance with certain obligations. Under Section 1(a), on or before the first Trading Day after the date on which Socket receives an Exercise Notice, Socket is required to "transmit by facsimile an acknowledgment of confirmation of receipt of such Exercise Notice" in the form annexed to the Warrant. Under the same provision, on or before the Third Trading Day after the date on which

3

Socket receives an Exercise Notice (the "Share Delivery Deadline"), Socket is required to deliver (at Hudson Bay's election, through either electronically crediting Hudson Bay's balance account with The Depository Trust Company or delivery of physical certificates) to Hudson Bay the "aggregate number of shares of Common Stock to which the Holder is entitled pursuant to such exercise."

13. "[I]n addition to all other remedies available," Section 1(c) of the Warrant provides Hudson Bay with a specific remedy for Socket's breach of its obligation to deliver the applicable Warrant Shares within the Share Delivery Deadline If Socket fails "for any reason or for no reason," to deliver the Warrant Shares to which Hudson Bay is entitled upon exercise of the Warrant within the Share Delivery Deadline, Socket is required to "pay in cash to the Holder on each day after such Share Delivery Deadline that the issuance of such shares of Common Stock is not timely effected an amount equal to 2% of the product of (A) the aggregate number of shares of Common Stock issued to the Holder on a timely basis and to which the Holder is entitled and (B) the Closing Sale Price of the Common Stock on the Trading Day immediately preceding the last possible date on which the Company could have issued such shares of Common Stock to the Holder without violating Section 1(a)."

14. To induce Hudson Bay to purchase the Warrant, Socket agreed to provide Hudson Bay with full-ratchet anti-dilution protection. Under Section 2 of the Warrant, Socket agreed that the Initial Exercise Price of the Warrant is subject to an automatic downward adjustment in the event Socket thereafter issued or was deemed to have issued shares, or securities convertible into shares, at a price per share that was lower than the exercise or conversion price then in effect ("Dilutive Issuance(s)").

15. Specifically, Section 2(b)(ii) of the Warrant states: "If [Socket] in any manner issues or sells any Convertible Securities[1] and the lowest price per share for which one share of Common Stock is *issuable* upon conversion, exercise or exchange thereof is less than the Applicable Price, then such share of Common Stock *shall be deemed outstanding and to have been issued and sold by [Socket] at the time of the issuance or sale of such Convertible Securities for such price per share*." (Emphasis added)

16. Notably, Socket knew and had reason to know the critical importance of these anti-dilution protections to Hudson Bay. When the parties negotiated these protections, Socket proposed that these protections should terminate if any future convertible securities or options Socket issued or sold would expire unconverted or unexercised. Hudson Bay refused to agree to this because the mere issuance of a dilutive security or option has an adverse effect on the market and the public's perception of the issuer. For this reason, Hudson Bay insisted and Socket agreed to the protection in Section 2(b)(ii) of the Warrant. This provision automatically triggers anti-dilution protections upon the sale or issuance of a dilutive Convertible Security and provides that the downward adjustment occurs based upon the price for which Socket's Common Stock would be issuable upon exercise – irrespective of whether an exercise actually occurs.

17. In the event that Socket engaged in a Dilutive Issuance, Section 2 of the Warrant provides for the automatic: (a) reduction of the Exercise Price of the Warrant to an amount equal to the consideration per share of Common Stock that Socket received for the Dilutive Issuance ("New Exercise Price"), making the New Exercise Price the price of the shares obtainable upon exercise of the Warrant; and (b) a corresponding increase in the number of Warrant Shares covered by the Warrant. As a result of the foregoing, the aggregate amount payable to exercise

---

[1] Pursuant to Section 16(l) of the Warrant, "Convertible Securities" means any "stock or other security (other than options) that is at any time and under any circumstances, directly or indirectly, convertible into, exercisable or exchangeable for, or which otherwise entitles the holder thereof to acquire, any shares of Common Stock."

5

the right to purchase all of the adjusted number of Warrant Shares at the adjusted exercise price remains the same as the aggregate amount payable to exercise the right to purchase the smaller number of original Warrant Shares at the higher Initial Exercise Price prior to the dilutive issuance adjustment under Section 2 of the Warrant.

18. Demonstrating the significance to Hudson Bay of Dilutive Issuance protection, Socket agreed in Section 3(i) of the Amended SPA, entitled "Dilutive Effect", that "the number of…Warrant Shares will increase in certain circumstances" and that its obligation to issue such shares upon conversion or exercise is "absolute and unconditional…"

19. Socket further agreed to several additional material provisions as further safeguards for Hudson Bay from the effect of a Dilutive Issuance.

20. Socket warranted that it would not issue convertible notes with "reset" provisions tied to the occurrence of some future event. In Section 4(n) of the Amended SPA, Socket agreed that it would not issue or sell any Convertible Securities such as convertible notes or warrants with a conversion or exercise price "that is subject to being reset at some future date after the issuance of such Convertible Securities or upon the occurrence of specified or contingent events directly or indirectly linked to the business of the Company…." Section 4(n) further provides that Hudson Bay would be "entitled to obtain injunctive relief against [Socket] to preclude any such issuance, which such remedy shall be in addition to any right to collect damages."

21. Socket agreed to notify Hudson Bay promptly of any event that causes an automatic reduction of the Exercise Price and a commensurate automatic increase in the number of Warrant Shares issuable upon exercise of the Warrant. Under Section 8 of the Warrant, Socket is obligated to provide Hudson Bay with "prompt written notice of all actions taken pursuant to [the] Warrant, including in reasonable detail a description of such action and the

reason therefor[,]" including written notice "immediately upon each adjustment of the Exercise Price and the number of Warrant Shares, setting forth in reasonable detail, and certifying, the calculation of such adjustment(s) . . . ." This notice provision is designed to make sure that Socket could not engage in a transaction amounting to a Dilutive Issuance without Hudson Bay's knowledge.

22. Along the same lines, if Hudson Bay requested information related to a Dilutive Issuance, including information related to Socket's compliance of its obligations under the instruments, Socket specifically agreed to provide such information to Hudson Bay. Under Section 14 of the Warrant, Socket agreed to "provide all information and documentation to the Holder that is requested by the Holder to enable the Holder to confirm the Company's compliance with the terms and conditions" of the Warrant.

23. Socket committed to act in good faith to protect Hudson Bay's rights under the Warrant, and not to engage in transactions that would undermine the Warrant's value. Thus, under Section 5 of the Warrant, Socket agreed that it would not ". . . through any . . . issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any terms" under the Warrant, and it would "at all times in good faith carry out all the provisions" of the Warrant and "take all action as may be required to protect the rights of [Hudson Bay]."

24. Socket also agreed in the Amended SPA to protect Hudson Bay's name from unauthorized disclosure. Under this material term, Socket agreed in Section 4(i) of the Amended SPA: "Without the prior written consent of the applicable Buyer [Hudson Bay], the Company shall not (and shall cause each of its Subsidiaries and affiliates to not) disclose the name of such Buyer in any filing, announcement, release or otherwise."

25. Finally, under Section 14 of the Warrant and Section 9(m) of the Amended SPA, Hudson Bay is entitled to seek all available remedies at law or in equity for a breach of the terms of the Warrant and Amended SPA, including specific performance and injunctive relief. Further, under Section 9(k) of the Amended SPA, Hudson Bay is entitled to reimbursement and indemnification of its costs and attorneys' fees for pursuing legal action against Socket for its failure to comply with and for breaching the terms of the Warrant and the Amended SPA.

**Disclosure of Two Dilutive Issuances And The Dilutive Effect.**

26. *First Dilutive Issuance.* In its September 10, 2013 public filing with the Securities and Exchange Commission, Socket disclosed that on September 4, 2013 it replaced $350,000 of notes plus accrued interest (total of $380,696) previously issued to officers and directors of Socket with new four-year notes expiring September 4, 2017. These "new notes" have an interest rate of 8% that compounds at the end of each quarter and are convertible into Common Stock "at the option of the holder at $2.44 per share as long as warrants previously issued to [Hudson Bay] are outstanding, *or at the closing market price on the date of note issue of $1.25 per share.*" (Emphasis added.) A true and correct copy of Socket's 8-K filing is attached hereto as Exhibit D.

27. Because the holders of these notes can convert both principal and interest, the holders will be eligible to convert $522,614, the total value of the note upon maturity, into 418,091 shares of Common Stock. Pursuant to Section 2 of the Warrant, the amount of shares is calculated by dividing the total value of the note at maturity ($522,614) by the lowest price at which the shares could be issued ($1.25).

28. However, given that only $350,000 in cash consideration was paid for the notes, the lowest cash consideration potentially payable per share of Common Stock would be $0.8371,

which equates to cash consideration paid ($350,000) divided by the highest potential number of shares of Common Stock attainable by the holders (418,091).

29. The issuance of these new notes automatically triggered the anti-dilution provisions in Section 2(b)(ii) of the Warrant because Socket issued Convertible Securities in which the lowest price per share for one share of Common Stock is issuable upon conversion, exercise, or exchange thereof at a price less than the price of the Initial Exercise Price of Hudson Bay's Warrant.

30. Thus, the first Dilutive Issuance automatically triggered an adjustment: (a) to the Warrant's Exercise Price from $1.25 to $0.8371 and a commensurate increase in the number of shares of Common Stock to 1,457,413 shares.

31. *Second Dilutive Issuance.* In that same public filing, Socket also disclosed that on September 4, 2013 it replaced $350,000 of notes plus accrued interest (total of $371,929) issued to a director of Socket at various dates in November and December 2012 with a four-year replacement note expiring September 4, 2017. This replacement note has an interest rate of 18% during all periods while the warrants issued to Hudson Bay are outstanding, or at a rate of 12% thereafter, and compounding quarterly. The replacement note is convertible into shares of Common Stock at the option of the holder at $2.44 per share as long as warrants previously issued to [Hudson Bay] are outstanding, ***or at the closing market price on the date of note issue of $1.25 per share***[.]" *See* Ex. D (emphasis added).

32. Because the holder of this note can convert both principal and interest, the holder will be eligible to convert $689,677.88, the total value of the note upon maturity, into 551,742 shares of Common Stock. Pursuant to Section 2 of the Warrant, the amount of shares is

9

calculated by dividing the total value of the note at maturity ($689,677.88) by the lowest price at which the shares could be issued ($1.25).

33. However, given that only $350,000 in cash consideration was paid for the original notes, the lowest cash consideration potentially payable per share of Common Stock would be only $0.6344, which would equate to cash consideration paid ($350,000) divided by the highest potential number of shares of Common Stock attainable by the holder (551,742).

34. The issuance of this new note automatically triggered the anti-dilution provisions of Section 2(b)(ii) of the Warrant because Socket issued a Convertible Security in which the lowest price per share for one share of Common Stock is issuable upon conversion, exercise, or exchange thereof at a price less than the price of the Initial Exercise Price of Hudson Bay's Warrant.

35. Thus, this Second Dilutive Issuance automatically triggered a further adjustment to the Warrant's Exercise Price from $0.8371 to $0.6344 and a commensurate increase in the number of shares of Common Stock to which Hudson Bay is entitled to 1,923,077 shares.

36. Finally, the Dilutive Issuances breached the "reset" bar in Section 4(n) of the Amended SPA, which prohibits Socket from issuing notes that are reset "after the issuance of such Convertible Securities or upon the occurrence of specified or contingent events directly or indirectly linked to the business of the Company...." According to Socket's public disclosure of the Dilutive Issuances, the notes Socket issued are subject to "being reset at some future date" based upon whether the Hudson Bay warrants are outstanding.

**Socket Failed to Notify Hudson Bay of Dilutive Issuance and Hudson Bay Invokes Anti-Dilution Provision.**

37. In contravention of its contractual obligations under Sections 5 and 8 of the Warrant, Socket failed to provide Hudson Bay immediate written notice of the aforementioned Dilutive Issuances, and to protect Hudson Bay rights pursuant to the Warrant.

38. Hudson Bay only learned about the Dilutive Issuances through Socket's public filings.

39. On or about September 23, 2013, Hudson Bay notified Socket that the Warrant's anti-dilution provisions had been triggered by the Dilutive Issuances and requested that Socket comply with the terms of the Warrant and adjust the exercise price and number of Warrant Shares.

40. In an email response dated September 24, 2013, Socket offered to re-write the instruments to "eliminate any debate on triggering dilution."

41. Socket's proposed resolution is improper and ineffective because, *inter alia*: (1) a breaching party to an agreement cannot unilaterally re-write the agreement in order to avoid its breach; and (2) re-writing the instruments without substantively changing the terms of the transactions could not avoid the dilutive effect of the Dilutive Issuances; the holders of the new notes would have to pay additional consideration in order to avoid the dilutive effect.

**Improper Multiple Public Disclosures of Hudson Bay's Name.**

42. Socket also breached the Amended SPA on multiple occasions by improperly disclosing Hudson Bay's name, without its consent, in its public securities filings in violation of Section 4(i) of the Amended SPA. In at least one instance, Socket's disclosure provided inaccurate information about Hudson Bay.

43. On or about April 15, 2013, Socket filed a Schedule 14A Proxy Statement with the Securities and Exchange Commission that improperly disclosed Hudson Bay's name and provided inaccurate information about Hudson Bay. In this Proxy Statement, Socket disclosed Hudson Bay's name without Hudson Bay's consent in a section purporting to identify the beneficial ownership of its Common Stock. The disclosure inaccurately states that, at the time, Hudson Bay beneficially owned 500,000 shares or 9.3% of Socket's Common Stock. In fact, however, Hudson Bay did not (and does not) own 500,000 shares of Socket's Common Stock. More importantly, Hudson Bay *never* could own 9.3% of Socket's Common Stock because Section 1(i) of the Warrant explicitly bars Hudson Bay from beneficially owning more than 4.99% of Socket's Common Stock.

44. Socket knew and had reason to know of this ownership limitation but still publicly represented that Hudson Bay had exceeded it.

45. On or about August 13, 2013, in its Form 10Q, Socket again identified Hudson Bay by name in Socket's description of convertible notes that Socket issued whose conversion price was linked to whether the Hudson Bay warrants were outstanding.

46. In the above-referenced disclosure of Dilutive Issuances on September 10, 2013, Socket again identified Hudson Bay by name, referencing Hudson Bay's name six times in its descriptions of the terms of the Dilutive Issuances.

47. Before making these multiple improper disclosures, Socket never requested nor did Hudson Bay ever consent to Socket's public disclosure of its name.

48. By disclosing Hudson's Bay name without prior consent, Socket breached the non-disclosure requirements under the Amended SPA and injured Hudson Bay in at least the following ways: (a) giving the market a false impression regarding the extent of Hudson Bay's

12

holdings in Socket; (b) inaccurately implying that Hudson Bay had violated the provision in the Warrant that bars Hudson Bay from beneficially owning more than 4.99% of Socket's Common Stock.

49. When Hudson Bay brought this unauthorized disclosure to Socket's attention, Socket did not dispute that it violated Section 4(i) of the Amended SPA. Rather, Socket stated that it requested guidance from the Securities and Exchange Commission on the issue of such disclosure.

50. Socket's failure to comply with Section 4(i) of the Amended SPA cannot, however, be cured by an opinion of the Securities and Exchange Commission. Irrespective of the Securities and Exchange Commission's response to Socket's inquiry, Socket is still liable to Hudson Bay for its breach under the terms of the parties' contract.

**Hudson Bay Exercised the Warrant.**

51. On October 4, 2013, Hudson Bay delivered an Exercise Notice to Socket notifying it that Hudson Bay was exercising its warrant for 493,149 Warrant Shares (out of the 1,923,077 Warrant Shares exercisable pursuant to such Warrant after giving effect to the anti-dilution adjustments described herein) on a cashless basis at the exercise price of $0.6344 for 242,866 Warrant Shares. Pursuant to the cashless exercise provisions of Hudson Bay's Warrant, Hudson Bay exercised its Warrant for 493,149 Warrant Shares and is deemed to have paid its aggregate exercise price on a cashless basis through the withholding by Socket of 250,283 Warrant Shares. After giving effect to such cashless exercise, Socket is required to deliver 242,866 Warrant Shares to Hudson Bay (the difference between the total number of Warrant Shares Hudson Bay sought to exercise (493,149 shares) and the total number of Warrant Shares

required to be withheld pursuant to the cashless exercise provisions of the Warrant as payment of the aggregate exercise price (250,283 shares).

52. Pursuant to Section 1(a) of the Warrant, Socket was obligated to send Hudson Bay an acknowledgement of confirmation of its October 4, 2013 exercise notice on or before October 7, 2013, *i.e.*, the first Trading Day after receipt of the exercise notice. Socket was further obligated to deliver 242,866 Warrant Shares to Hudson Bay on or before October 9, 2013, *i.e.*, the Share Delivery Deadline.

53. In an "Acknowledgment" dated October 7, 2013, Socket refused to honor Hudson Bay's exercise notice by stating that Socket had "not established that Hudson Bay Master Fund Ltd. is entitled to submit this Cashless Exercise Notice and accordingly, are unable to process the request at this time."

54. Despite its contractual obligation to do so, Socket has failed and refused to comply with its contractual obligations to acknowledge the validity of Hudson Bay's exercise notice and to timely deliver the appropriate number of Warrant Shares to Hudson Bay.

## **FIRST CAUSE OF ACTION**
**(Declaratory Relief)**

55. Hudson Bay repeats and realleges the allegations contained in the preceding paragraphs and incorporates them by reference as if fully set forth herein.

56. The Warrant constitutes a valid and enforceable contract between Socket and Hudson Bay.

57. As disclosed in its public filing with the Securities and Exchange Commission, Socket issued Convertible Securities that triggered the anti-dilution provisions in Hudson Bay's Warrant.

58. Hudson Bay contends that the calculation of the consideration per share of

Common Stock that Socket received for the Dilutive Issuances is governed by Section 2 of the Warrant and results in a downward adjustment to Hudson Bay's Exercise Price to $0.6344 and a commensurate increase in the number of shares of Common Stock available to Hudson Bay to 1,923,077 shares.

59. Socket has failed to comply with its obligations under Hudson Bay's Warrant and, accordingly, a justiciable controversy has arisen and exists between the parties regarding the downward adjustment to the exercise price and upward adjustment to the number of Warrant Shares, pursuant to the Warrant.

60. The controversy is of sufficient immediacy and reality to warrant declaratory relief under 28 U.S.C. § 2201.

61. Hudson Bay seeks a declaration that, as of September 4, 2013, the Exercise Price pursuant to the Warrants has been adjusted to $0.6344 at maximum and the number of shares of Common Stock has been adjusted to 1,923,077 at minimum.

### SECOND CAUSE OF ACTION
**(Failure To Deliver Shares – Relief Sought: Preliminary and Permanent Injunction)**

62. Hudson Bay repeats and realleges the allegations contained in the preceding paragraphs and incorporates them by reference as if fully set forth herein.

63. Pursuant to the Warrant and Hudson Bay's October 4, 2013 notice of cashless exercise of such Warrant, Socket is obligated to immediately deliver to Hudson Bay a minimum of 242,866 Warrant Shares.

64. Despite its contractual obligation to do so, Socket has failed and refused to deliver said shares of stock to Hudson Bay.

65. Because the terms of the Warrant plainly require Socket to deliver the requested shares of Common Stock to Hudson Bay and Socket has failed to comply, Hudson Bay's

likelihood of success on the merits is clear and substantial.

66. In the absence of injunctive relief, Hudson Bay will suffer irreparable harm because, *inter alia*: (a) money damages are inadequate because compelling compliance rather than simply awarding money damages reinforces the sanctity of bargains between corporations and investors; (b) the parties expressly agreed in the Warrant that Socket's failure to comply with its contractual obligations would cause Hudson Bay irreparable harm, *i.e.*, could not be adequately compensated by money damages; (c) further delay by Socket in delivery of the shares of Common Stock to Hudson Bay could result in a substantial loss in value of Socket's Common Stock, which is very volatile and thinly traded; and (d) it is unlikely that Socket will be able to satisfy any ultimate damage award given that Socket recently disclosed its precarious financial state in its June 2013 Quarterly Report:

> As of June 30, 2013, **the Company has an accumulated deficit of $60,383,870.** The Company's cash balances at June 30, 2013 were $659,834, including $1,145,053 advanced on its bank lines of credit. At June 30, 2013, the Company had additional unused borrowing capacity of approximately $410,000 on its bank lines of credit. The Company's balance sheet at June 30, 2013 has a current ratio (current assets divided by current liabilities) of 0.5 to 1.0, and a working capital deficit of $3,658,592 (current assets less current liabilities). **These circumstances raise substantial doubt about the Company's ability to continue as a going concern.** [Emphasis added.]

67. Socket will suffer no harm if it is ordered to comply with its contractual obligations under the Warrant. On the other hand, Hudson Bay will suffer the irreparable harm described above if Socket does not deliver the Warrant Shares to which Hudson Bay is entitled.

68. As a result, Hudson Bay is entitled to injunctive relief, both preliminarily and permanently, directing Socket to deliver to Hudson Bay at a minimum of 242,866 Warrant Shares.

## **THIRD CAUSE OF ACTION**
(Damages)

69. Hudson Bay repeats and realleges the allegations contained in the preceding paragraphs and incorporates them by reference as if fully set forth herein.

70. <u>Failure to Provide Notice of Dilutive Issuances</u>. The Warrant obligated Socket to provide Hudson Bay with notice and information regarding any Dilutive Issuances.

71. Despite its contractual obligation to do so, Socket failed to notify and to provide information about two Dilutive Issuances to Hudson Bay to Hudson Bay's detriment.

72. <u>Breach of "Reset" Bar</u>. In Section 4(n) of the Amended SPA, Socket warranted that it would not issue convertible notes with "reset" provisions tied to the occurrence of some future event.

73. Despite this provision, the notes connected to the Dilutive Issuances are tied to the occurrence a future event -- whether the Hudson Bay Warrant is outstanding -- to Hudson Bay's detriment.

74. <u>Failure to Deliver Warrant Shares</u>. Pursuant to the Warrant and Hudson Bay's October 4, 2013 cashless exercise of such Warrant, Socket was obligated to send Hudson Bay written acknowledgement of the exercise of the Warrant on or before October 7, 2013.

75. Pursuant to the Warrant and Hudson Bay's October 4, 2013 cashless exercise of such Warrant, Socket was obligated to deliver to Hudson Bay a minimum of 242,866 Warrant Shares on or before October 9, 2013, *i.e.*, the Share Delivery Deadline.

76. In breach of its contractual obligations pursuant to Section 1(a) of the Warrant, Socket has failed and refused to acknowledge Hudson Bay's October 4, 2013 exercise notice and timely deliver the appropriate number of Warrant Shares to Hudson Bay.

77. In addition to all other remedies available to Hudson Bay, as a result of Socket's failure to deliver the appropriate number of Warrant Shares to Hudson Bay within the Share Delivery Deadline, Hudson Bay is entitled to a cash payment from Socket pursuant to Section 1(c) of the Warrant.

78. <u>Improper Disclosure of Hudson Bay's Name.</u> Socket breached Section 4 of the Amended SPA by disclosing the name of Hudson Bay in public filings without first obtaining Hudson Bay's consent to Hudson Bay's detriment.

79. The foregoing breaches have injured Hudson Bay.

80. Hudson Bay thus seeks an award of damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Hudson Bay Master Fund, Ltd demands judgment against Defendant Socket Mobile, Inc. as follows:

1) declaring that, as of September 4, 2013, the Exercise Price pursuant to the Warrant has been adjusted to $0.6344 at maximum and the number of Warrant Shares has been adjusted upward, giving Hudson Bay a minimum of 1,923,077 post-adjustment Warrant Shares;

2) ordering Socket to immediately comply with its obligations under Sections 8 of the Warrant to produce full and complete information and documentation to Hudson Bay regarding the Dilutive Issuances, so that Hudson Bay can confirm Socket's compliance with the terms and conditions of the Warrant;

3) ordering Socket to immediately comply with its obligations under Section 1(a) of the Warrant to deliver to Hudson Bay a minimum of 242,866 Warrant Shares;

4) awarding Hudson Bay's damages in an amount to be determined at trial;

5) awarding Hudson Bay attorneys' fees and other costs and expenses incurred in this action pursuant to Section 14 of the Warrant and Sections 9(k) and 9(m) of the Amended SPA; and

6) granting Hudson Bay such other and further relief as this Court may deem just and proper.

Dated: October 9, 2013

Respectfully submitted,

s/ Gabriel Aizenberg
Scott Mendeloff (ARDC #6184901)
mendeloffs@gtlaw.com
Gabriel Aizenberg (ARDC #6236614)
aizenbergg@gtlaw.com
Greenberg Traurig, LLP
77 W. Wacker Dr., Suite 3100
Chicago, IL 60601
Phone: (312) 456-8400
Fax: (312) 456-8435

*Attorneys for Plaintiff Hudson Bay Master Fund, Ltd.*